BYRON L. HOWARD, JR. and SHARON K. HOWARD, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Howard v. Commissioner
Docket No. 8532-72.
United States Tax Court
T.C. Memo 1974-200; 1974 Tax Ct. Memo LEXIS 119; 33 T.C.M. (CCH) 869; T.C.M. (RIA) 74200; July 31, 1974, Filed. Byron L. Howard, Jr. and Sharon K. Howard, pro se. Howard S. New, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: Respondent determined deficiencies in the income tax of petitioners for the taxable year 1970 *120 in the amount of $922.49. The sole question for our determination is whether any of the amounts paid to petitioners Byron L. Howard, Jr., by the University of Texas Southwestern Medical School from National Institute of Mental Health grants in the taxable year 1970 for his participation in that school's residency program in general psychiatry is excludable from gross income as a fellowship grant under section 117. [2]
FINDINGS OF FACT Some of the facts have been stipulated. Such facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Byron L. Howard, Jr., and Sharon K. Howard are husband and wife whose place of residence at the time of the filing of the petition herein was Dallas, Texas.Petitioners filed a timely joint Federal income tax return for the taxable year 1970. Byron L. Howard, Jr. (hereinafter referred to as "petitioner"), received a Doctor of Medicine Degree from the University of Texas Southwestern Medical School, Dallas, Texas (hereinafter referred to as "Southwestern") in June of 1967. [3] He was licensed *121 to practice medicine in the State of Louisiana and the State of Texas in July of 1967 and in January of 1968, respectively. Southwestern is an organization described in section 501(c) (3) and exempt from tax under section 501(a). In June of 1968, petitioner finished a 1-year internship at the Southern Baptist Hospital in New Orleans, Louisiana. He then entered a 1-year residency in general psychiatry at Timberlawn Psychiatric Hospital in Dallas before transferring into a 3-year residency program at Southwestern in July of 1969. He completed the residency program at Southwestern in June of 1971, having been given credit for his year of residency at Timberlawn. The residency program at Southwestern was coordinated with several hospitals in the Dallas area, including Parkland Memorial Hospital (hereinafter "Parkland"). [4] The residents would often be rotated through several of these affiliated hospitals during the course of their training, in addition to being assigned to certain psychiatric clinics operated by Southwestern. *122 The clinics were organized to provide certain facilities or experience that was required for an approved residency in general psychiatry but was not available at any of the affiliated hospitals. [5]
During the taxable year in question, petitioner was primarily assigned to Parkland. Parkland, in conjunction with Woodlawn Hospital (hereinafter referred to as "Woodlawn"), is operated by the Dallas County Hospital District (hereinafter referred to as "DCHD"), a public body created and organized under the laws of the State of Texas primarily for the purpose of supplying medical care to indigent and needy residents of Dallas County. Pursuant to an agreement between the DCHD and Southwestern in 1967, it was agreed that Southwestern would be responsible for *123 staffing both hospitals with "a sufficient number of qualified physicians to adequately direct and supervise professional medical services to all inpatients and outpatients" at Parkland and Woodlawn. Accordingly, the permanent staff at both hospitals is drawn directly from the faculty of Southwestern, and the doctors who serve as heads of the departments, divisions, or services of Southwestern, assume the same positions of authority at the hospitals. In exchange therefor, Southwestern was granted the opportunity to use the hospitals' facilities for clinical teaching and research for its medical students, interns, and residents under conditions of actual responsibility for patient care. Parkland is a general hospital which serves as the primary teaching facility of Southwestern and is located immediately adjacent thereto. Woodlawn is a special hospital which is located at some distance from Southwestern and is primarily devoted to the treatment and care of adolescent and adult patients with serious mental and nervous disorders. Both hospitals admit patients on the basis of their medical need rather than restricting admissions to cases involving unusual teaching aspects. [6]
*124 The residents were appointed to these hospitals by the DCHD upon the nomination of the chiefs of the appropriate department, division, or service responsible for the supervision and training of such personnel. Pursuant to the terms of the above agreement, the expense of hiring such interns or residents was borne entirely by the DCHD although Southwestern agreed to assist where it was able to obtain special funds for the training programs of certain interns and residents. During the first 6 months of 1970, petitioner spent 4 hours a week at Parkland in a consultation service capacity. For the last 6 months of 1970, petitioner was assigned to Parkland's outpatient clinic where he was required to spend 5 days each week, 4 hours per day. Petitioner was also on emergency room call at Parkland every eleventh day, including weekends and holidays for the entire year 1970. Weekday emergency call required staying at the hospital for 15 hours while weekend call required 24-hour attendance. He was the only physician of his service physically present at the hospital when on emergency room call. Petitioner's general duties at Parkland were similar to those of any salaried staff physician *125 and included evaluating and treating patients through the outpatient clinic; direct responsibility for the diagnosis and treatment of patients in the outpatient clinic and the emergency room; acting as a consultant on referrals from other specialties; prescribing drugs; writing patients' histories; and admitting patients to the outpatient clinic. Patients were assigned to petitioner on the basis of rotation, not on the basis of the training aspects of the case. His work at Parkland was subject to the close supervision and direction of the medical staff at the hospital. Being listed on the house staff at Parkland, he was neither registered as a student nor was he a candidate for any academic degree. [7]
Almost all of the duties performed by the petitioner and other residents for Parkland would have required the attention of a staff physician had the petitioner and other residents not been available. The additional presence of the residents enhanced the quality of medical care the DCHD offered to its sick and indigent patients. In addition to his duties at Parkland during 1970, petitioner was also assigned *126 to the Adult Psychiatry Clinic (hereinafter referred to as "APC") and the Child Psychiatry Clinic (hereinafter referred to as "CPC"), both of which were operated by Southwestern. At APC, to which he was assigned for the full year, petitioner carried a four-patient load and spent approximately 5 to 10 patient-related hours per week at the clinic. He spent an additional 2 hours a week in conference with his supervison. At CPC, to which he was assigned for the first 6 months of 1970, petitioner carried an eight-patient load and spent approximately 8 to 12 patient-related hours per week at the clinic. He would spend an additional 1 hour per week in conference with his supervisor. All patients requesting help through the clinic could not be seen. Instead, patients were selected depending on the teaching needs of the clinic at the time. An attempt was made to accept a wide range of problems in children of various ages from different cultural groups. During the time petitioner was assigned to the CPC, he was expected to do and did diagnostic evaluation of his patients and, on occasion, their families. In addition, he saw patients regularly in therapy sessions. Fees for care were *127 determined by a sliding fee scale which considered the monthly income of the patient's parents, the number of dependents and their debt status. After determining these factors during the initial interview, resident would set the patient's hourly fee according to a published fee schedule. Fees ranged from approximately $1 to $20 per hour depending upon the financial status of the patient's parents. The activities of petitioner relating to his assignment to the CPC were subject to the direction, supervision, and control of the staff of the clinic. The training the petitioner received from the duties performed at Parkland, APC, and CPC, was essential for an approved residency in general psychiatry. Another prerequisite was formal didactic instruction through prepared lectures, seminars, assigned reading, roundtable conferences, journal clubs and lectures by visitors. During the year in question, petitioner attended such didactic instruction which, dependent upon his rotation, would account for approximately 10 hours a week. Throughout the year in question, petitioner was under contract with the DCHD. By the terms of the contract, he agreed to "conform to all rules and regulations *128 governing the institution, discharging all duties of House Staff Officer as determined by the Management and Staff." Upon satisfactory completion of his duties as a resident or intern, the DCHD agreed to issue a certificate indicating satisfactory performance of such duties. Such certificate would be forfeited if he failed to remain in service for the full time of his contract. The contract further provided that petitioner was prohibited from engaging in any form of private practice except in those instances which had been given prior approval and which applied to all members of the house staff. While on the house staff at Parkland, petitioner had Federal income and insurance contribution act taxes withheld from monthly payments from the DCHD which kept employee records on petitioner reflecting an hourly wage rate and a specific job code number. Petitioner also received 2 weeks paid vacation per year, free hospitalization coverage and medical care, free laundry for uniforms, a meal allowance, sick leave, and was eligible to join the DCHD employees credit union. In 1970, petitioner received $6,992.55 from the DCHD. He excluded none of these amounts from gross income and has *129 conceded they represent compensation for services rendered to Parkland. Petitioner also received in 1970 the sum of $7,666.62 from Southwestern for his participation in that school's residency program in general psychiatry. None of the amounts paid to petitioner by Southwestern was determined on the basis of financial need, but on the basis of a fixed sum for each level of residency, increasing yearly as the resident attained additional skill and experience. The source of these funds was the U.S. Department of Health, Education, and Welfare, Public Health Service, National Institute of Mental Health (hereinafter referred to as "NIMH") trainee stipend grants to Southwestern. The NIMH publication entitled "Grants and Awards of the National Institute of Mental Health for Graduate and Undergraduate Training" (December 1966) states the primary purpose of such grants is "to improve the quality of mental health training; to enlarge the capacity for training people; to help in the development of specialized training programs; and, through trainee stipend awards, to enable a greater number of persons to pursue careers in the mental health disciplines and related areas." The publication *130 further provides that such grants are not awarded directly to individuals by the NIMH but that the trainee institutions are charged with the disbursement of funds. Aside from a few minimal educational and citizenship requirements, the selection of the qualified recipients is left entirely up to the discretion of the grantee institution. Receipt from Southwestern of such training stipends funded by the NIMH grants was conditioned upon satisfactory participation in all aspects of the residency program. Those residents who received equivalent amounts of money from other sources were not selected for NIMH grants so that a uniformity of pay scale could be maintained at each level of residency. [8]
On his joint income tax return for 1970, petitioner excluded from gross income $3,600 of the above amounts received from Southwestern as excludable fellowship grants. Respondent *131 contends none of the amounts received from Southwestern is excludable.
OPINION The sole question for our determination is whether any of the amounts paid to petitioner by Southwestern from NIMH grants in the taxable year 1970 for his participation in that school's residency program in general psychiatry is excludable from gross income as a fellowship grant under section 117. The facts of this case are indistinguishable in substance from those in Geral W. Dietz, 62 T.C. [*] (July 31, 1974), with which this case was consolidated for purposes of trial. For the reasons stated therein, we hold that none of the amounts received by petitioner from Southwestern in 1970 qualifies for exclusion under section 117. In accordance with the above, Decision will be entered for the respondent. Footnotes
1. The following cases were consolidated herewith for trial only: Thomas A. Woods and Georgialy W. Woods, docket No. 7120-72; Geral W. Dietz and Johanna C. Dietz, docket No. 7147-72; Donald D. and F. Diane Fagelman, docket No. 7633-72. Separate opinions will be written for each case. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
3. Sharon K. Howard is a party to this proceeding only by virtue of having filed a joint federal income tax return with her husband, Byron L. Howard, Jr. ↩
4. The official title of the program was "Southwestern Medical School Affiliated Hospitals Residency Program." ↩
5. In order for a residency program to be approved by the American Board of Psychiatry and Neurology and the Council on Medical Education of the American Medical Association, it had to meet the requirements of the Essentials of Approved Residencies, which are published by the Council for each specialty or service. ↩
6. In 1970, Parkland admitted over 330 psychiatry inpatients and had an average daily psychiatry inpatient census of more than 40, representing approximately 14,600 inpatient days. With respect to psychiatry and psychiatry follow-up matters, 6,000 persons, averaging between 16 and 17 persons per day were treated by Parkland through the outpatient clinic and emergency room. ↩
7. House staff is a term used to refer only to residents and interns. ↩
8. For instance, the residents in psychiatry who were assigned to either the Veterans Administration Hospital or Terrell Hospital, which was run by the State of Texas, would receive as a base salary from those hospitals the equivalent of what petitioner received from the DCHD and the NIMH grants combined. ↩